IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Criminal Case No. 07-cr-00275-WYD

UNITED STATES OF AMERICA,

      Plaintiff,

v.

7. ANA NEMECIA OROZCO;
8. BEATRIZ MUNOZ-CARRILLO;
15. EVARISTO OROSCO;
16. MARTHA OROSCO;
23. CYNTHIA OROSCO,

      Defendants.

---

## ORDER

---

THIS MATTER came before the Court during hearings on March 16, 2009, May 7, 2009, August 14, 2009, and August 27, 2009 on the issue of whether evidence recovered during illegal searches conducted on October 17, 2007 was obtained pursuant to independent sources. Throughout the course of the proceedings, the parties have filed multiple briefings with the Court, the government has presented testimony, and both sides have presented exhibits and argument. Having taken the foregoing into account, I enter the following written order.

## A. BACKGROUND

In an order dated July 17, 2008, Judge Edward W. Nottingham granted Defendants' motions to suppress evidence seized on October 17, 2007 from 11538 Nucla Street, 200 Clayton Street, 5910 South Ogden Court, and 4080 West 48th

Avenue.  *United States v. Orozco*, 575 F. Supp. 2d 1191 (D. Colo. 2008).  In that order,

Judge Nottingham noted that the government had indicated the existence of

independent sources for some of the evidence obtained during the illegal searches.  *Id.*

at 1213.  Judge Nottingham stated, "The Government is expected to provide an

adequate foundation - including chain of custody evidence where applicable - for any

evidence it seeks to admit at trial and that it claims derives from any source other than

execution of the four instant warrants."  *Id.*

Then, during a September 17, 2008 status conference before Judge Nottingham,

the government further clarified its intent to introduce evidence suppressed by the Court

on an independent source theory.  Government counsel said, "100 percent of the bank

documents were obtained by grand jury subpoena, and the government is in the

process of allowing counsel to have access to discovery in this case so that we can

establish . . . that these records were obtained by grand jury subpoena and not pursuant

to the search warrant."  (Hr'g Tr. [doc. #1024-2] 5, Sep. 17, 2008.)  Government counsel

also made reference to numerous administrative subpoenas.  Judge Nottingham then

ordered the government to produce to Defendants grand jury subpoenas and

administrative subpoenas and to identify, by Bates stamp number, what was obtained

via these subpoenas and what was obtained during the illegal searches.

After this case was reassigned to me on October 31, 2008, the parties

recommended that I hold a "modified *Kastigar* hearing" in order to determine the

government's independent sources for evidence seized during the illegal searches.

During the March 16, 2009 hearing on whether the government had complied with

Judge Nottingham's order, the government represented that it had been unable to

match specific documents it had received with specific grand jury and administrative subpoenas.  I then reviewed discovery that the government had produced to Defendants, and at the May 7, 2009 hearing I found that the government's form of discovery and its inability to match documents with specific subpoenas merely impacted its ability to meet its burden of proving independent source, and thus no additional findings were required with respect to the government's compliance with Judge Nottingham's order.  I set a hearing on the independent source issue for August 14, 2009.  I also ordered the government to file "the most expansive and comprehensive pleading that tells me and tells the parties what your position is regarding how you can show that there is an independent basis for this evidence that arguably is tainted because some of it was discovered based on these warrants that were suppressed by Judge Nottingham."

On June 18, 2009, the government filed a submission that consisted entirely of a chart, which was later received into evidence as Exhibit 12.  This chart is in essence a more detailed version of Exhibit 8, which is an index of discovery.  In addition to matching ranges of documents to general sources—e.g., grand jury, search warrant, or witness—Exhibit 12 also identifies specific grand jury subpoenas.  In many cases, the chart matches a specific range of documents to a specific grand jury subpoena, but in other cases the chart lists a number of subpoenas for a particular Bates range.  For administrative subpoenas, the chart continues to list merely "DEA Subpoena," along with the respondent to that subpoena, without specifying a particular subpoena or group of subpoenas.  Defendants responded to this filing on July 27, 2009, therein arguing that the government's chart does not demonstrate how the government has met its

burden, and further claiming that much of the evidence obtained after October 17, 2007 was tainted by the illegal searches.

At the August 14, 2009 hearing I heard the testimony of IRS Agent Arnold J. Gehring and the direct and cross-examination portions of DEA Agent Albert Villasuso's testimony, and the government introduced a number of exhibits into evidence. At the August 27, 2009 continuation of the hearing, I heard Agent Villasuso's redirect and re-cross, and in the course of redirect the government introduced a number of additional exhibits into evidence. The parties also presented argument at the August 27 hearing. Throughout the course of the proceedings, all of the government's exhibits to which I refer in this Order were received into evidence.

## B. ANALYSIS

### 1. Limitations

Before proceeding with the analysis, I must note that I am constrained in the findings I am able to make at this time, because the government has not proceeded in the most effective manner. Rather than identifying those pieces of evidence seized from the illegal searches that come from independent sources, the government has, for the most part, merely attempted to demonstrate which of its sources are untainted by the searches. Only in a few cases has the government even demonstrated what evidence its other sources produced, as in most cases it only identified the sources themselves. Thus, only in a few cases am I presently able to make findings with respect to whether evidence seized during the illegal searches comes from an

independent source. Rather, for the most part, I can only determine what sources are in

fact independent, and only in a few cases can I identify untainted evidence.

Furthermore, Defendants have expanded the scope of the matters before me by arguing that additional evidence obtained after the searches was tainted. Although Defendants never filed additional motions to suppress evidence, I have entertained these arguments because I find it appropriate and efficient to do so in the present context. Much of the government's presentation of independent source was done in a piecemeal manner, and mostly in response to Defendants' allegations. Grand jury subpoenas are the only category of independent source for which the government made any sort of comprehensive showing. Accordingly, my analysis must also proceed in a piecemeal manner, producing a variety of findings in response to the specific arguments presented by the parties. Thus, while this Order was initially intended to consist of findings as to whether various pieces of evidence seized during the illegal searches could be linked to independent sources, because of the manner in which the parties have proceeded, it now contains a variety of findings, most of which merely pertain to which sources of evidence are untainted by the illegal searches.

### 2. Standard

There are "three exceptions to the exclusionary rule which permit the use of tainted evidence if the prosecution shows by a preponderance of the evidence that the evidence sought to be introduced was or could have been secured by means sufficiently distinguishable to be purged of the primary taint." *United States v. Griffin*, 48 F.3d 1147, 1150 (10th Cir. 1995) (citation and quotation omitted). Evidence obtained in violation of the Fourth Amendment "may be admitted if it: (1) has but an attenuated link to the underlying illegality; (2) derived from a source independent of the illegal conduct; or (3)

would have been inevitably discovered absent the illegality." *Id.* (citations omitted).  In failing to make any sort of comprehensive argument in the present context, the government has never explicitly identified the theory under which it was proceeding. However, it has alluded to the independent source doctrine on multiple occasions, and at least on one occasion it mentioned inevitable discovery.

The Tenth Circuit has laid out the parameters of the independent source doctrine as follows:

> Under this exception, "evidence that has been discovered by means wholly independent of any constitutional violation" is admissible against a criminal defendant, notwithstanding any antecedent Fourth, Fifth, or Sixth Amendment violation.  In applying the doctrine in the Fourth Amendment context, the dispositive question is whether the source of probable cause claimed by the government is "in fact a genuinely independent source of the information and tangible evidence at issue . . . ."  A source is genuinely independent if the government can show that the evidence was obtained by "means sufficiently distinguishable to be purged of the primary taint." By contrast, a source is not independent if, "granting establishment of the primary illegality, [the evidence has] been come at by the exploitation of the illegality."

*United States v. Forbes*, 528 F.3d 1273, 1278 (10th Cir. 2008) (quoting *Murray v. United States*, 487 U.S. 533, 538, 542 (1988); *Nix v. Williams*, 467 U.S. 431, 443 (1984); *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)) (alterations in original). "The government bears the burden of showing, by a preponderance of the evidence, that there is truly an independent source for the challenged evidence." *Id.* at 1279.  The Tenth Circuit in *Forbes* further suggested that the independent source should be "conceptually unrelated" to the illegal search or be "a sufficiently distinguishable means of obtaining the necessary probable cause that an independent source for the evidence

existed to purge any taint from the [constitutional violation]."  *Id.* at 1280.[1]

Similar to the independent source doctrine, the inevitable discovery doctrine "permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it.'"  *United States v. Martinez*, 512 F.3d 1268, 1273 (10th Cir. 2008) (quotation omitted).  "The burden rests on the government to prove by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."  *Id.* (quotation omitted).

### 3. Grand Jury Subpoenas

#### a. Independence

I find that the government has met its burden of proving that all of the grand jury subpoenas that it has produced in discovery constitute sources independent of the illegal searches.  Agent Gehring testified as to how the returns from grand jury subpoenas were processed and maintained, and he testified that these returns were maintained at a separate location from the where the evidence obtained from the illegal searches was maintained, without any co-mingling of the two groups of evidence. According to the government's Exhibit 7, which is an index of grand jury subpoenas, only the following numbered grand jury subpoenas listed in Exhibit 12 were issued after October 17, 2007: 07-1576, 07-1648, 07-1649, 07-1657, 07-1658, and 07-1665.  At the March 16 hearing, Agent Gehring testified with regard to subpoena 07-1576, which was

---

[1] Throughout the case, the proceeding presently at issue has been referred to as a "modified *Kastigar* hearing."  In *Kastigar v. United States*, 406 U.S. 441 (1972), the Supreme Court held that in any subsequent criminal prosecution of a person who has been granted immunity to testify, the prosecution has the burden of proving affirmatively that evidence proposed to be used is derived from a legitimate source wholly independent of compelled testimony.  *Id.* at 460.  Thus, the analogous *Kastigar* analysis for qualified immunity is similar to the Fourth Amendment standard, but the Fourth Amendment standard is more appropriate for the present context.

received as Exhibit 1.  The last page of that exhibit is the grand jury subpoena request form, which demonstrates that Agent Villasuso made his request to the United States Attorney's office for the subpoena on October 15, 2007.   Accordingly, the basis for that subpoena arose prior to, and independently of, the October 17, 2007 illegal searches.

Then, at the August 14 hearing, Agent Gehring testified as to the independent basis for each of the other five subpoenas at issue, and they were received into evidence.  Specifically, Exhibit 2, which contained subpoena 07-1657 issued to JP Morgan Chase, was issued based on records received from the auto dealership Land Rover East.  Those records were received pursuant to a subpoena issued prior to October 17, 2007.  Exhibit 3, subpoena 07-1648 to Waste Management, and Exhibit 4, subpoena 07-1658 issued to Warren Federal Credit Union, were issued pursuant to information received during a bond hearing for Defendant Rafael Ramirez-Birrueta.[2] The subpoena to Waste Management was never issued, so no documents were received in return.  Exhibit 5, subpoena 07-1649 to JP Morgan Chase, and Exhibit 6, subpoena 07-1665 to Bank One, were issued to follow up on documents received pursuant to previous grand jury subpoenas issued before October 17, 2007.  Agent Gehring maintained during cross-examination, and in response to various forms of questioning, that nothing obtained during the illegal October 17, 2007 searches led government agents to issue these subpoenas and that these subpoenas were thus independent of the searches.

Defendants' primary contention is that the government cannot match specific

---

[2] Bond hearings for this Defendant, occurred on October 17, 2007, October 31, 2007, and November 2, 2007.  The government never specified exactly to which hearing it was referring.

documents to specific grand jury subpoenas.  Defendants also note that the evidence obtained pursuant to grand jury subpoenas was never Bates-stamped.  Because the government has demonstrated that all the grand jury subpoenas issued after the search had independent bases, it need not match documents with specific grand jury subpoenas, as long as it can demonstrate that documents were received pursuant to grand jury subpoenas generally.  Accordingly, the government has met its burden of proving that all of the evidence obtained pursuant to grand jury subpoenas is untainted.

### b. Returns

The government has also demonstrated that certain bank records and loan records alleged by Defendants to be tainted came from independent grand jury subpoenas.  Exhibits 32 through 36 pertain to bank records, and Exhibits 37 and 38 pertain to loan records.  Although Agent Villasuso testified as to the independent sources for the grand jury subpoenas contained in these exhibits, such testimony was unnecessary, because all the subpoenas were issued prior to October 17, 2007.  The only part of this testimony that was necessary was that the check and bank records included in Exhibit 33, the check included in Exhibit 35, the check included in Exhibit 36, and the loan records included in Exhibits 37 and 38 were obtained pursuant to grand jury subpoenas.  I find these documents to be untainted by the illegal searches. Villasuso testified as to the specific grand jury subpoenas issued before the searches that produced these documents, and, as noted above, Agent Gehring's testimony established that the government maintained grand jury subpoena returns separately from the evidence obtained during the search.  Thus, I find that Agent Villasuso's testimony that these documents were obtained pursuant to grand jury subpoenas to

satisfy the government's burden of proving independent source for these documents.

### 4. Vehicles

Much of the government's presentation concerned evidence in connection with a number of vehicles.  In a June 18, 2009 filing submitted in connection with a separate matter in this case [doc. #1253], the government discussed civil seizure warrants issued for nine vehicles.  The government further represented that six of those vehicles were seized and administratively forfeited, one was seized but not administratively forfeited, and two were never located.  The government attached the seizure warrants for six of the seven seized vehicles: a 2002 Panoz taken from 200 Clayton, a 2006 Porsche Cayenne take from 5910 S. Ogden, a 2002 Mercedes-Benz CL 600 taken from 11538 Nucla, a 2007 Jeep Cherokee taken from 11538 Nucla, a 2007 Cadillac Escalade taken from 900 West 70th Place, and a 2005 Ford F150 taken from 11538 Nucla.  All these warrants appear to have been issued on October 9, 2007 and returned executed on October 17, 2007 - the date of the illegal searches - at 7:00 a.m.  The other vehicles discussed in the government's filing are a 2002 Mercedes-Benz CLK320, a 2006 BMW, and a 2004 BMW.  The CLK320 was seized and forfeited, while neither of the BMW's was located.  All of these vehicles appear in the forfeiture count in the superseding indictment in this case, the lone exception being that a 2004 Land Rover Discovery appears instead of the 2007 Jeep Cherokee.

Government counsel made numerous references to the seizure warrants during the hearings presently at issue.  Agent Villasuso testified that he generally was aware of the existence of the vehicles at issue, and whose name they were titled in, prior to October 17, 2007.  Again, the government's presentation was not comprehensive, so I

only make findings as to the exhibits and testimony that were presented.  The three categories of evidence that were specifically contested are the evidence obtained from the trunk of the Mercedes CL600 at 11538 Nucla, the DEA subpoena regarding repair records on the CL600, and vehicle titles.

### a. Documents from Trunk of Mercedes-Benz CL600

During the October 17, 2007 search of 11538 Nucla, there were a number of items, mostly documents, seized from the trunk of a Mercedes-Benz CL600 parked there.  As noted above, this car was seized also on October 17, 2007, pursuant to a civil seizure warrant issued October 9, 2007.  The items at issue are listed on the return for the search of the real property, while the only thing listed on the return for the seizure of the vehicle is the vehicle itself.  At the hearing, Agent Villasuso presented extensive testimony as to the surveillance of the Mercedes-Benz CL600 that led to its seizure. Exhibits 39 through 41 are photographs taken by the agents who conducted the search at 11538 Nucla on October 17, 2007, and Exhibits 42 through 44 depict August 2007 pole camera footage of the vehicle and the contents of its trunk.  Agent Villasuso emphasized the similarity of the condition of the contents of the trunk at the two points in time.  He also testified that surveillance never observed the trunk being opened between those two points in time.

I find that the contents of the trunk are admissible evidence pursuant to the inevitable discovery doctrine.  The contents of the trunk would have been discovered pursuant to the routine inventory search that would have been conducted pursuant to the valid seizure of the vehicle.  This seizure occurred the same day as the search of the real property, and Agent Villasuso's testimony supports a finding that the contents of

the trunk had been left in the condition in which they were found for some time. Furthermore, Agent Villasuso testified extensively as to the independent surveillance of the vehicle that led to its seizure.  Thus, I find that the contents of the Mercedes-Benz CL600, though recovered pursuant to the illegal October 17, 2007 search of 11538 Nucla, inevitably would have been discovered pursuant to the vehicle's valid civil seizure.

### b. DEA Subpoena for Repair Records

Defendants alleged in their July 27, 2009 filing that a DEA subpoena issued on October 18, 2008 for repair records on a 2002 Mercedes was based on information gained during the illegal searches.  Agent Villasuso testified that on October 16, 2008, he issued a DEA subpoena to Mercedes-Benz of Littleton for service records on the 2002 Mercedes-Benz CL600.  This subpoena was received as Exhibit 20.  Villasuso testified that this subpoena was issued based upon pole camera surveillance of the vehicle in August 2007.  He also spoke with a service technician at Mercedes-Benz of Littleton, who told him that Mercedes-Benz of Westminster had done a more current service on the CL600.  Accordingly, he issued a subpoena to Mercedes-Benz of Westminster, which was received as Exhibit 21, on October 17, 2008.  Although Villasuso did not provide a specific reason for the delay in issuing these subpoenas, I find that through his testimony, the government has met its burden of proving that these two DEA subpoenas constitute sources independent of the October 17, 2007 illegal searches, and thus the records they produced are untainted by the searches.

### c. Title Records

In their July 27, 2009 filing, Defendants contend that government agents found car titles during the search of 200 Clayton and that the government developed investigatory leads and gathered further tainted evidence from the Department of Motor Vehicles, as the result of the illegal seizure of these car titles.  The government's evidence at the hearing for the most part did not produce titles themselves, but it did, again, establish an independent chain of evidence.  Exhibit 18 is the return for the queries of the 2004 BMW, the 2002 Mercedes-Benz CL 600, and the 2002 Panoz.  Agent Villasuso testified that these queries were conducted based on interviews of Joseph Torrez, Greg Montgomery, and Daniel Valdez.  The 2004 BMW was queried on March 1, 2007, and the other two vehicles were queried on January 23, 2007.  Agent Villasuso testified that he followed up his initial query of the 2004 BMW with another DMV query and that Exhibit 28 consists of the results of that query, showing dates of January 29, 2007 and January 31, 2007, along with pole camera shots of that vehicle at 11538 Nucla in September 2007.

Exhibit 19 consists of the summary of an October 3, 2007 interview with Adams County DMV employee Aida Pasquali that concerned a BMW, along with the records pertaining to the Mercedes-Benz CLK 320 and the 2007 Cadillac Escalade that she printed out.  Exhibit 29 consists of a May 11, 2007 DMV query with regard to the Mercedes-Benz CLK 320, which Agent Villasuso testified led to the issuance of a DEA subpoena issued to Georgia Power on February 21, 2008.  That subpoena, which is included in Exhibit 30, then produced a Georgia title for the CLK 320, which is also included in Exhibit 30.  I find that the government's showings with respect to Exhibits 18,

19, 28, 29, and 30 satisfy its burden of proving independent source.

### 5. DEA Subpoenas

Again, the government has not made any sort of comprehensive presentation with respect to DEA subpoenas, but rather it has responded to Defendants' allegations of taint.  I note that there are a number of DEA subpoenas mentioned in the context of findings with respect to other categories of evidence.  Apart from those subpoenas, the hearings focused on a DEA subpoena issued to Aviacsa Airlines and DEA subpoenas that returned phone records.

### a. Aviacsa Airlines

Defendants have alleged that a DEA subpoena issued to Aviacsa Airlines was tainted by the search.  Agent Villasuso testified that this subpoena, issued on October 25, 2007 and included in Exhibit 23, was issued based on returns from a grand jury subpoena issued to Wells Fargo on May 23, 2007 and included in Exhibit 22.  Specifically, Villasuso testified that in reviewing the credit card statement that Wells Fargo produced, which was also included in Exhibit 22, the agents noticed a charge to Aviacsa Airlines, leading them to issue the DEA subpoena on October 25, 2007.  Accordingly, I find that the government has met its burden of proving that the DEA subpoena issued to Aviacsa Airlines on October 25, 2007 constitutes an independent source.

### b. Phone Records

Defendants have also alleged that various DEA subpoenas issued for phone records are tainted by the illegal searches.  In response, the government made a

number of showings at the hearings.  Most importantly, Agent Villasuso testified that

neither he nor anyone else learned of any new telephone numbers from the illegal

searches on October 17, 2007.  Specifically, Exhibit 24 consists of a composite of DEA

subpoenas issued to AT&T Wireless and T-Mobile USA, along with some records

returned.  Only one of these subpoenas, the subpoena issued to AT&T on December 4,

2007, was issued after the illegal searches.  Agent Villasuso testified that this subpoena

was issued based on records returned from the previous subpoenas for the same

phone number and that the purpose of the subpoena was to try to locate fugitive

Defendant Samuel Orozco.  Exhibit 25 contains a number of DEA subpoenas issued to

AT&T Wireless for various phone numbers from July 18, 2007 until February 13, 2008.

Agent Villasuso testified that all of the numbers for which subpoenas were issued were

learned from earlier subpoenas.  I find that the government has met its burden of

proving that the DEA subpoenas contained in Exhibits 24 and 25 constitute independent

sources.

However, I cannot make the same finding with respect to Exhibits 26 and 27.  No

testimony was presented with respect to Exhibit 26, which consists of DEA subpoenas

to Cricket Communications ranging from March 8, 2007 until February 14, 2008.  Exhibit

27 consists of DEA subpoenas issued to T-Mobile USA from May 24, 2007 until

November 27, 2007.  Agent Villasuso testified that he did not know how DEA Agent

Daniel Padilla, who issued these subpoenas, obtained knowledge of the phone numbers

at issue.  Even though Villasuso testified that no new knowledge of phone numbers was

obtained during the search, it is still problematic that specific demonstrations were not

made with respect to these two exhibits.  Accordingly, I find that the government has not

met its burden with respect to the DEA subpoenas contained in Exhibits 26 and 27.

**6. Witnesses**

Defendants have alleged that the government gained knowledge of a number of witnesses it interviewed as a result of the illegal searches.  In response, the government presented testimony and evidence in support of these witnesses' independence from the searches.  Agents Gehring and Villasuso testified repeatedly that they had knowledge of all the witnesses in question prior to the searches but that these witnesses were not interviewed until after the searches in order to avoid compromising the government's investigation.  I find that the government has met its burden of proving that its knowledge of witnesses Dora Morales, Ramona Anaya, Dora Romero, Beatriz Quezada, Timothy Schmitz, Roderick Hosang, and Steve Cisneros was obtained from sources independent of the illegal searches.  However, I find that the government has not met its burden with respect to Armando Martinez-Anaya.

**a. Ramona Anaya**, **Dora Morales, Dora Romero, and Beatriz Quezada**

Agent Villasuso testified that Ramona Anaya and Dora Morales were employees of Colorado Lending Group, a company owned by Defendant Samuel Orozco.  Villasuso testified that he first learned of these two individuals some time after March 2007, through requests of title histories of 11538 Nucla and 200 Clayton.  He further testified that he already knew of them prior to October 1, 2007, when surveillance of Defendant Beatriz Munoz-Carrillo led government agents to a vehicle owned by these two individuals.  He testified that research with respect to this vehicle also led the agents to individuals named Dora Romero and Beatriz Quezada.  A report of this surveillance was

received as Exhibit 31.

### b. Timothy Schmitz and Roderick Hosang

Timothy Schmitz and Roderick Hosang were owners of alleged load houses in Smyrna, Georgia area.  Agent Villasuso testified that he learned of these two individuals after receiving returns from DEA subpoenas issued to Georgia Power and the Cobb County Water System on April 23, 2007.  The documents associated with this testimony are contained in Exhibits 14, 15, 16, and 17.  Villasuso testified that he received some returns on May 9, 2009 and that several days later he conducted property searches that identified Schmitz and Hosang as the owners of the two properties.

### c. Steve Cisneros

Agent Villasuso testified that Steve Cisneros was a mortgage broker who worked for Colorado Lending Group.  Villasuso testified that the loan records that were obtained pursuant to grand jury subpoena and contained in Exhibits 37 and 38 led government agents to Steve Cisneros, because those documents indicated that he conducted a loan interview with Defendant Cynthia Orosco and one with Defendants Evaristo and Martha Orozco.

### d. Armando Martinez-Anaya

Unlike the other witnesses I have just discussed, I cannot find that the government has met its burden of proving independent source with respect to Armando Martinez-Anaya.  Agents Gehring and Villasuso testified that they first learned of an individual named Armando Martinez, an alleged load driver for Samuel Orozco, through an interview with Joseph Torrez on April 4, 2007.  They testified that Torrez told

government agents that Martinez been arrested on a drug charge.  They also testified

that Greg Montgomery had told them about an individual named Antonio Martinez.  Both

agents maintained that they subsequently discovered Martinez's location in the Bureau

of Prisons through research conducted by DEA Agent Daniel Padilla.  However, Agent

Gehring testified that the government obtained records during the searches that

corroborated the information they already had about Armando Martinez-Anaya, and that

the government asked him about those records during his interviews.  Furthermore,

Agent Villasuso testified that they learned of the name "Anaya" through the searches.

The government presented no evidence, other than the agents' testimony, of their

independent source for their interview with this witness.  Accordingly, I find that at this

point the government has not met its burden of proving that its interviews of Armando

Martinez-Anaya were independent of the searches.  The case may be that only some of

the questioning was tainted by the searches, but at this point the government has not

made a sufficient showing for me to be able to make any distinctions or any specific

findings with respect to any interviewing of this witness.

### 7. Suppression of Statements Made During Search

Defendants Martha and Evaristo Orosco have also argued that the statements

they made during the October 17, 2007 search of 11538 Nucla should be suppressed,

as those statements were a byproduct of the illegal search of that residence.  Evaristo

Orosco's argument has actually come in the context of a motion for return of property,

but again, I find it appropriate to entertain this argument now because it pertains to taint

from the illegal searches.  Both Defendants had previously filed Motions to Suppress

the statements based upon allegations that they were made involuntarily in violation of

the Fifth and Sixth Amendments.  Judge Nottingham denied those motions from the

bench during a hearing on July 1, 2008, finding that both Defendants understood their

rights and freely spoke to both agents without any coercion.  (Hr'g Tr. [doc. #775] 182,

Jul. 1, 2008.)

I have reviewed the transcript of the July 1, 2008 hearing, which included

testimony by DEA Agent Ralph Villarruel, who questioned Martha Orosco, and DEA

Special Agent Jose Garcia, who questioned Evaristo Orosco.  Garcia testified that the

agents arrived early in the morning of October 17, 2007 at 11538 Nucla, where Evaristo

Orosco answered the door.  Both agents testified that they immediately told him they

had a search warrant for the premises and that the timing of their statement that he was

under arrest pursuant to a federal arrest warrant was probably also immediate.  Once

Martha Orosco was retrieved, Agent Villarruel informed the Oroscos of their

constitutional rights in Spanish, they said they understood, and the separate questioning

of each proceeded.

Agent Villarruel testified that while he was questioning Martha Orosco, agents

brought over a gym bag containing a large quantity of currency.  He testified that she

initially said the bag was hers but when pressed she admitted it belonged to her son

Samuel Orozco.  The rest of the questioning pertained to topics not having to do with

the search, including Martha Orosco's sources of income, the whereabouts of Samuel

Orozco, and Martha Orosco's knowledge of co-defendant Beatriz Munoz-Carrillo.

Similarly, the only questioning of Evaristo Orosco having to do with property recovered

from the residence pertained to money and documents recovered from a safe.  Agent

Garcia testified that he asked Evaristo Orosco about the safe because it had been

mentioned during debriefing.  Evaristo Orosco then took him to a room containing a

safe, and Garcia opened the safe and saw the money and documents before closing it

back up.  Garcia testified that Evaristo Orosco then told him that Samuel Orozco was

the owner of the safe and was the only person with access to it.  The rest of the

questioning pertained to Evaristo Orosco's financial situation and his knowledge of

Samuel Orozco.

Agent Villarruel testified that the agents left with Evaristo and Martha Orosco

before the search was completed.  The money in the gym bag about which Martha

Orosco was questioned and the money and documents in the safe about which Evaristo

Orosco was questioned in the safe were both listed among the returns from the search

of 11538 Nucla.  I find that the statements about this property are the only statements

by Evaristo and Martha Orosco that are tainted by the search.  Martha Orosco was only

asked about the gym bag after the agents conducting the search recovered it, and in

fact the government has conceded that these statements are tainted.  And although

Agent Garcia testified that he knew about a safe prior to arriving at the residence and

was led to the safe after asking Evaristo Orosco about it, I find that this statement was

also tainted by the illegality of the search.  Evaristo Orosco had been told about the

search warrant prior to making this statement, and one cannot assume that he would

have made those statements and led Garcia to the safe otherwise.


I find that the Oroscos' other statements were made independently of the illegal

search because they would have been made pursuant to their valid arrests.  Those

statements did not pertain to anything recovered during the search.  Defendants argue

that all their statements should be suppressed, relying upon *United States v. Washington*, 387 F.3d 1060 (9th Cir. 2004).  That case is inapposite because it involved consent to a second search, which the Ninth Circuit found to be invalid, after officers had already repeatedly violated the defendant's Fourth Amendment rights.  *Id.* at 1071-72.  Also inapposite is *Brown v. Illinois*, 422 U.S. 590 (1975), the Supreme Court case relied upon by the Ninth Circuit in *Washington*.  In *Brown*, the Supreme Court held that *Miranda* warnings alone are not sufficient to attenuate the taint of an unconstitutional arrest.  *Id.* at 602-03.  The present circumstances are in contrast to both those cases, as the Oroscos were questioned pursuant to arrest warrants after being apprised of their constitutional rights, and certain lines of questioning would have occurred absent the illegal search of their residence.  I note that my present findings are consistent with the law of the case and specifically Judge Nottingham's previous ruling, because that ruling pertained to the voluntariness of the Oroscos' statements, and he had not yet found the searches to be illegal.

**C. CONCLUSION**

Based upon the foregoing, it is hereby

ORDERED that the government's arguments presented in its filings and at the hearings are **GRANTED in part and DENIED in part**, consistent with the findings and

rulings contained in this Order.

Dated:  November 3, 2009

BY THE COURT:

s/ Wiley Y. Daniel_____
Wiley Y. Daniel
Chief United States District Judge